IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| BLACKHORSE OILFIELD SPECIALTY & SUPPLY, LLC, | § § § | |
| Plaintiff, | § § | |
| v. | § § | CIVIL ACTION NO. H-14-847 |
| LK TRADING, LLC, and MANIDHARI GUMS & CHEMICALS, | § § § | |
| Defendants. | § § | |

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER ON PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Pending is Plaintiff's Application for a Writ of Sequestration or, in the Alternative, for Preliminary Injunction (Document No. 13), to which Defendant LK Trading, LLC has filed its response in opposition.[1] On May 20, 2014, the Court conducted an evidentiary hearing at which the parties by and through their counsel presented witnesses and offered exhibits received in evidence. After having considered the motion, response, the evidence received, the arguments of counsel, the parties' supplemental briefing, and the applicable law, the Court makes the following findings of fact and conclusions of law.

---

[1] Defendant Manidhari Gums & Chemicals has not been served nor appeared.

## Findings of Fact

From a preponderance of the evidence received at the evidentiary hearing, the Court finds, for purposes of the pending motion only, as follows:

## Background

1.    Plaintiff Blackhorse Oilfield Specialty & Supply, LLC ("Blackhorse") is a Texas limited liability company specializing in procuring products and materials for clients in the oil and gas industry.  Jason Legnon ("Legnon") is the principal and sole owner of Blackhorse.

2.    Since Blackhorse began operating in 2011, it has engaged in buying and selling guar gum, a substance used primarily as a gelling agent in oil and gas production fracking operations.

3.    Martin Korn ("Korn") is the president of New Age Holdings, LLC ("New Age"), a broker of oilfield chemicals and supplies.  Korn formerly did business through another entity he owned, Victory Oilfield Supplies, LLC ("Victory").  Legnon has known Korn since 2008, and Blackhorse has bought guar gum from both Victory and New Age.

4.    Defendant Manidhari Gums & Chemicals ("Manidhari") is an Indian supplier of guar gum operated by Manish Chhajer ("Chhajer").  Manidhari has sold guar gum to Victory and New Age.

2

5.    Manidhari has also sold guar gum to Defendant LK Trading, LLC ("LK Trading"), a Louisiana importer of guar gum, which is solely owned by Shovan Das ("Das"), a resident citizen of Louisiana.

<u>The Goods</u>

6.    On June 17, 2013, LK Trading issued a purchase order to Manidhari for ten batches of fast hydrating guar gum, totaling 400,000 pounds, at a total cost of approximately $980,000. In September 2013, these ten batches were delivered under LK Trading's name to a warehouse in La Porte, Texas operated by Overland Distribution ("Overland").

7.    LK Trading contracted for purchase of the foregoing 400,000 pounds of guar gum with the intent to resell it to its customer, Preferred Quality Services. Preferred Quality Services, however, took possession of only six of the ten batches, and made only a partial payment of $215,000 to LK Trading for those six batches. Four of the ten batches, or approximately 160,000 pounds of guar gum, remain in the Overland warehouse under LK Trading's name.

8.    LK Trading paid to Manidhari most of the $215,000 it received from Preferred Quality Services, but defaulted on its own obligation to pay to Manidhari the balance of the $980,000 purchase

price.  LK Trading concedes it is in breach of its contract with Manidhari, and owes Manidhari approximately $750,000.

9.  The four batches of guar gum, totaling 160,000 pounds of guar gum ("the Goods"), which remain in the Overland warehouse under LK Trading's name, are identified in the warehouse by container numbers BSIU2277795, CAIU2614210, TGHU2906711, and CAIU2677287.

10.  LK Trading has possession of the Goods and is trying to sell them, but has not paid Manidhari for them.

11.  The price of guar gum, which changes daily, has dropped significantly since LK Trading agreed to purchase the Goods from Manidhari.  LK Trading promised to pay $2.45 per pound for the Goods, but their current market value is only $1.53 per pound.

12.  Guar gum is perishable, with a shelf life of approximately two years.

13.  Guar gum is not fungible.  Because of the variation in grades and quality of guar gum, it is bought and sold in specific containers that are labeled and maintained as such.

<u>Blackhorse's Transaction</u>

14.  In early 2014, Blackhorse desired to purchase guar gum for resale to its prospective customer, Water Science Technology, an end user (the "Blackhorse Transaction").

15.   Blackhorse's owner Legnon inquired of Korn whether he had any available product.  Korn responded that he had ten containers, totaling 400,000 pounds, of guar gum available in Texas.

16.   Korn did not in fact have any available guar gum for sale to Blackhorse, but hoped to acquire it from Manidhari.

17.   Unbeknownst to Legnon, Korn and his former business entity Victory Oilfield Supplies LLC already were indebted to Manidhari from one or more previous transactions.  At some point before New Age defaulted on his obligation to Plaintiff to deliver to Blackhorse 200,000 pounds of guar gum, Korn in behalf of New Age signed in favor of Manidhari an undated "Declaration" that "the goods for purchase from Manidhari (invoice #2 and invoice #6) through Victory are being paid and settled by New Age because my previous company, Victory, is no longer in business.  All the responsibilities and rights of Victory now rest with New Age."

18.   Thus, New Age owed money to Manidhari for unpaid invoices to Korn's former business entity, Victory, and LK Trading owed money to Manidhari for a shipment of guar gum, 160,000 pounds of which LK Trading still held in the Overland warehouse and was anxious to sell.

19.   Korn's New Age never entered into a written contract with Manidhari to purchase a shipment of 200,000 pounds of guar gum but, according to Korn, Korn was led to believe by Manidhari that the

5

guar gum held by LK Trading in the Overland warehouse was actually owned by Manidhari and available for sale to New Age.

20.   Manidhari requested that LK Trading authorize the Overland warehouse to release samples of the Goods for Blackhorse and New Age to test, which LK Trading directed the warehouse to do.

21.   In early February, 2014, Korn and Legnon each separately went to the Overland warehouse and obtained samples from LK Trading's remaining batches of guar gum, which LK Trading had authorized Overland to provide to them.

22.   Legnon took no steps to verify either the availability for delivery of 200,000 pounds of guar gum from the Overland warehouse or that Manidhari was in fact the owner of the product. To the contrary, Legnon and Blackhorse--as they were entitled to do--relied entirely upon the representations of Korn and New Age, except for Legnon insisting that he himself wanted to test the product before purchasing it to make sure it met the requirements of Blackhorse's customer.

23.   Korn and Legnon both tested the guar gum samples, which tested slightly below the expected grade, but Blackhorse's customer, Water Science Technology, approved the test results as acceptable.

24.   Then on February 26, Blackhorse issued a purchase order to New Age for 200,000 pounds of fast hydrating 40-45 guar gum for a total price of $250,000.  The purchase order states, "I need all

6

batch numbers ASAP.   Please be sure the number[s] correspond to what they are shipping."

25.   The same day, New Age issued an invoice to Blackhorse for the guar gum, listing batch numbers 09092013, 10092013, 11092013, 12092013, and 13092013, and reciting that each of the five batches contained 20 bags of guar gum, with each bag containing 2,000 pounds of guar gum.   New Age's invoice stated the product was FOB the Overland warehouse, and payment terms required Blackhorse to pay cash before delivery.

26.   There is no evidence that either New Age or Manidhari was in possession of any batches of guar gum bearing those numbers in the Overland warehouse.

27.   After Water Science Technology paid to Blackhorse $270,000 for the 200,000 pounds of guar gum that Blackhorse was to deliver, Blackhorse wired $250,000 to New Age to pay for the 200,000 pounds of guar gum New Age promised to deliver.

28.   New Age, in turn, wired $238,000 to Manidhari in India. Manidhari subsequently refused to ship or to release any guar gum to New Age or to refund the money.

29.   When the guar gum was not delivered to Blackhorse, Legnon requested of Korn that New Age return his money to him, but Korn has refused to do so.

30.   Although Blackhorse's contract was with New Age, and although Korn had made all of the representations to Legnon that

7

Legnon in good faith relied upon in paying to New Age the $250,000, Blackhorse filed this suit not against New Age and Korn but rather against Manidhari and LK Trading, alleging against them causes of action for fraud, violation of the Texas Theft Liability Act, conversion, conspiracy, and aiding and abetting, and obtained a temporary restraining order prohibiting Defendants from selling or moving the Goods.

31.   LK Trading removed the case to this Court based on diversity of citizenship.   The temporary restraining order issued by the state court was extended by agreement until the present.

<u>Unlikelihood of Success on the Merits</u>
<u>of Plaintiff's Several Claims Against LK Trading</u>

32.   Blackhorse never had direct contact with LK Trading or with Manidhari regarding the Blackhorse Transaction, and neither LK Trading nor Manidhari made any oral or written representations to Blackhorse regarding the Blackhorse Transaction.

33.   According to his own uncontroverted testimony, Korn himself did not rely on any representations made by LK Trading regarding the Blackhorse Transaction and, apart from authorizing the Overland warehouse to provide to Korn and Legnon samples from the 160,000 pounds of guar gum it had received from Manidhari and not paid for, LK Trading had no involvement in the Blackhorse Transaction.

8

34.   Blackhorse therefore has not shown a likelihood of success on the merits of its fraud claim against LK Trading.

35.   Plaintiff has offered no evidence that LK Trading appropriated any money or property from Blackhorse, or money or property to which Blackhorse had a possessory right, and therefore Blackhorse has not shown a likelihood of success on the merits of its Texas Theft Liability Act claim against LK Trading.

36.   Blackhorse's only contract for the purchase of 200,000 pounds of guar gum was with New Age, and Blackhorse depended entirely on the representations of Korn and New Age that New Age would deliver to Blackhorse FOB at the Overland warehouse the guar gum that was promised by New Age. But Blackhorse had no agreement with LK Trading or Manidhari, and has not proven that its own payment of $250,000 to New Age entitles it to possession of the 160,000 pounds of guar gum that LK Trading holds in the Overland warehouse.

37.   Moreover, Blackhorse has not shown that New Age was entitled to sell to Blackhorse the Goods possessed by LK Trading.

38.   Because Blackhorse has not established that it had either legal or equitable ownership of the Goods, it has not shown a likelihood of success on the merits of its claim that LK Trading converted Plaintiff's personal property.

39.   There is no evidence that LK Trading and Manidhari conspired with one another to deprive Blackhorse of its property or

money, and hence Blackhorse has not shown a likelihood of success on its conspiracy claim against LK Trading.

40.   Because Plaintiff Blackhorse has failed to show a likelihood of success on the merits of any of its several claims against Defendant LK Trading, it has not shown itself entitled either to a writ of sequestration for the Goods held in the name of LK Trading in the Overland warehouse or to a writ of injunction that LK Trading not sell or dispose of such Goods.

## Conclusions of Law

**The Court makes the following conclusions of law:**

1.   The Court has diversity jurisdiction over the parties and the subject matter of this case.

## Preliminary Injunction Standard

2.   To obtain a preliminary injunction, an applicant must establish:

> (1) a substantial likelihood that he will prevail on the merits, (2) a substantial threat that he will suffer irreparable injury if the injunction is not granted, (3) his threatened injury outweighs the threatened harm to the party whom he seeks to enjoin, and (4) granting the preliminary injunction will not disserve the public interest.

Bluefield Water Ass'n, Inc. v. City of Starkville, Miss., 577 F.3d
250, 252-53 (5th Cir. 2009) (quoting Lake Charles Diesel, Inc. v.
Gen. Motors Corp., 328 F.3d 192, 195-96 (5th Cir. 2003)).

3.   A preliminary injunction is "an extraordinary remedy
which should not be granted unless the party seeking it has
'clearly carried the burden of persuasion' on all four
requirements." Id.

4.   The decision to grant or deny preliminary injunctive
relief is left to the sound discretion of the district court.
Miss. Power & Light Co. v. United Gas Pipe Line Co., 760 F.2d 618,
621 (5th Cir. 1985).

5.   An order of preliminary injunction can bind parties,
their agents, and others who are "in active concert or
participation" with those parties, but only those who receive
actual notice of the injunction. FED. R. CIV. P. 65(d)(2).

Writ of Sequestration Standard

6.   Blackhorse seeks a writ of sequestration pursuant to
Federal Rule of Civil Procedure 64 and Texas Civil Practices and
Remedies Code § 62.001.

7.   Rule 64 provides that "throughout an action, every remedy
is available that, under the law of the state where the court is
located, provides for seizing a person or property to secure

satisfaction of the potential judgment," and specifically enume-

rates sequestration as an available remedy.   FED. R. CIV. P. 64.

    8.   Section 62.001 provides that

> [a] writ of sequestration is available to a
> plaintiff in a suit if: (1) the suit is for title
> or possession of personal property . . . and a
> reasonable conclusion may be drawn that there is
> immediate danger that the defendant or the party in
> possession of the property will conceal, dispose
> of, ill-treat, waste, or destroy the property or
> remove it from the county during the suit.

TEX. CIV. PRAC. & REM. CODE § 62.001.

    9.   Sequestration is an extraordinary remedy.  *See* Baragas v.

Coupland State Bank, 03-01-00098-CV, 2001 WL 1509972, at *1 n.3

(Tex. App.-Austin Nov. 29, 2001).

    10.  To comport with due process of law, a party seeking

sequestration must establish a probability of success on the merits

of his case.  *See* Mitchell v. W. T. Grant Co., 94 S. Ct. 1895, 1901

(1974) ("[T]here is scant support in our cases for the proposition

that there must be final judicial determination of the seller's

entitlement before the buyer may be even temporarily deprived of

possession of the purchased goods.  On the contrary, it seems

apparent that the seller with his own interest in the disputed

merchandise would need to establish in any event only the

probability that his case will succeed to warrant the bonded

sequestration of the property pending outcome of the suit.")

(upholding Louisiana sequestration statutes); Lincoln Ten, Ltd. v.

White, 706 S.W.2d 125, 128 (Tex. App.-Houston [14th Dist.] 1986) (even though Mitchell was "concerned with the application of due process protection to consumers," its standard is "applicable to due process requirements concerning prejudgment seizures in a commercial setting").

### Governing Law

11.   The Texas Uniform Commercial Code ("UCC") applies to "transactions in goods." TEX. BUS. & COM. CODE § 2.102. The UCC definition of "goods" is broad, including "all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale." Id. § 2.105(a); Propulsion Techs., Inc. v. Attwood Corp., 369 F.3d 896, 900 (5th Cir. 2004) ("This definition is broad. . . . [The UCC] is a general body of law intended as a unified coverage of its subject matter.").

12.   The sale of guar gum is a sale of goods governed by the UCC.

13.   Under the UCC, a contract for the sale of goods for the price of $500 or more is generally unenforceable "unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker." TEX. BUS. & COM. CODE § 2.201(a). However, "[a] contract which does not

13

satisfy the requirements of Subsection (a) but which is valid in other respects is enforceable . . . (3) with respect to goods for which payment has been made and accepted or which have been received and accepted." Id. § 2.201(c).

### Fraud Elements

14.   Under Texas law, a plaintiff alleging fraud must prove (1) a material misrepresentation (2) which was false, and (3) which was either known to be false when made or was asserted without knowledge of its truth, (4) which was intended to be acted upon, (5) which was relied upon, and (6) which caused injury. Bohnsack v. Varco, L.P., 668 F.3d 262, 272 (5th Cir. 2012) (citing Sears, Roebuck & Co. v. Meadows, 877 S.W.2d 281, 282 (Tex. 1994)).

### Texas Theft Liability Act Elements

15.   The Texas Theft Liability Act ("TLA") provides that "[a] person who commits theft is liable for the damages resulting from the theft," and defines theft as "unlawfully appropriating property or unlawfully obtaining services" under various provisions of the Texas Penal Code. TEX. CIV. PRAC. & REM. CODE §§ 134.002, 134.003(a).

16.   To succeed on a TLA claim, Blackhorse must establish that: (1) it had a possessory right to its property; (2) Defendants unlawfully appropriated Blackhorse's property in violation of the Penal Code; and (3) Blackhorse sustained damages as a result of the

14

theft.  <u>Wellogix, Inc. v. Accenture, LLP</u>, 788 F. Supp. 2d 523, 542
(S.D. Tex. 2011).

<u>Conversion Elements</u>

17.  To prove conversion under Texas law, the plaintiff must
show an unauthorized and wrongful assumption and exercise of
dominion and control over the personal property of another, to the
exclusion of, or inconsistent with, the owner's rights.  <u>Quantlab</u>
<u>Techs. Ltd. (BVI) v. Godlevsky</u>, 719 F. Supp. 2d 766, 777 (S.D. Tex.
2010) (citing <u>Waisath v. Lack's Stores</u>, 474 S.W.2d 444, 447 (Tex.
1971)).

<u>Civil Conspiracy Elements</u>

18.  To prove a cause of action for civil conspiracy under
Texas law, a plaintiff must establish the following elements:
(1) an agreement between two or more persons; (2) an object to be
accomplished; (3) a meeting of minds on the object or course of
action; (4) one or more unlawful, overt acts; and (5) damages as
the proximate result.  <u>Apani Sw., Inc. v. Coca-Cola Enterprises,</u>
<u>Inc.</u>, 300 F.3d 620, 635 (5th Cir. 2002) (citing <u>Massey v. Armco</u>
<u>Steel Co.</u>, 652 S.W.2d 932, 934 (Tex. 1983)).

19.  Although Blackhorse alleges a cause of action for "Aiding
and Abetting," Texas has not clearly recognized this as a cause of
action distinct from conspiracy.  *See* <u>Ernst & Young, L.L.P. v. Pac.</u>
<u>Mut. Life Ins. Co.</u>, 51 S.W.3d 573, 583 n.7 (Tex. 2001) ("[W]e do

15

not consider whether Texas law recognizes a cause of action for 'aiding and abetting' fraud separate and apart from a conspiracy claim").

## Conclusion

20.  Because Blackhorse has not met its burden to show a substantial likelihood of success on the merits of one or more of its claims against LK Trading, the Court need not consider the other elements required for a preliminary injunction.

21.  Blackhorse is not entitled to a preliminary injunction.

22.  Blackhorse is not entitled to a writ of sequestration.

23.  If any of the foregoing Findings of Fact constitute Conclusions of Law, they are adopted as such; and if any of the foregoing Conclusions of Law constitute Findings of Fact, they are adopted as such.

## **Order**

For the reasons set out, Plaintiff Blackhorse Oilfield Specialty & Supply, LLC's Application for a Writ of Sequestration or, in the Alternative, for Preliminary Injunction (Document No. 13) is DENIED.  It is further

ORDERED that the Temporary Restraining Order issued in state court on March 20, 2014 in connection with this case is VACATED.

The Clerk will enter this Order, providing a correct copy to all parties of record.

SIGNED at Houston, Texas, on this 23rd day of May, 2014.

EWING WERLEIN, JR.
UNITED STATES DISTRICT JUDGE